## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CADIENT LLC (f/k/a HSG SOLUTIONS LLC), a Delaware limited liability company,<br><br>          Plaintiff,<br>     v.<br><br>KRONOS TALENT MANAGEMENT, LLC, an Oregon limited liability company, and KRONOS INCORPORATED, a Massachusetts corporation,<br><br>          Defendants. | Civil Action No. 20-00773-CFC<br><br>█████████████<br><br>**PUBLIC VERSION**<br>**filed on January 5, 2021** |

## <u>AMENDED COMPLAINT</u>

Plaintiff Cadient LLC, f/k/a HSG Solutions LLC, d/b/a Cadient Talent ("Cadient" or "Plaintiff"), by and through undersigned counsel and as and for its Amended Complaint, brings this civil action against Defendants Kronos Talent Management, LLC ("KTM") and Kronos Incorporated ("Kronos Inc." together with KTM, "Kronos" or "Defendants").  Plaintiff alleges as follows:

## <u>INTRODUCTION</u>

1.      This action arises out of Defendants' breach of an Asset Purchase Agreement entered into as of December 21, 2018, by and among Cadient, KTM and Kronos Inc. (the "Purchase Agreement").  On April 5, 2019, pursuant to the terms of the Purchase Agreement, Cadient purchased substantially all the assets and certain

assumed liabilities of KTM for a cash purchase price (the "Purchase Price"). A portion of the Purchase Price was placed in escrow (the "Escrow Funds") to cover claims for indemnification Cadient might have against Kronos for breaches of the representations, warranties and covenants set forth in the Purchase Agreement.

2.      Following the closing of the asset purchase transaction, Cadient learned that Kronos breached the Purchase Agreement because (i) certain assets Kronos agreed to sell were not transferred to Cadient, (ii) certain of the assets sold and transferred to Cadient were not in good operating condition, (iii) Kronos has competed and is competing with Cadient in violation of the carefully negotiated non-competition provision, and (iv) Kronos has failed to pay contractually-mandated reimbursement amounts associated with certain colocation and application hosting services.

3.      As a result of Kronos' breaches of the Purchase Agreement, Cadient has been damaged in a monetary amount not less than $6.5 million. The damage caused to Cadient is in excess of the Escrow Funds due to Kronos' violation of the non-competition provision, which has caused significant damage to Cadient's ability to sign new customers, re-sign acquired customers, and its goodwill in the marketplace. Due to the nature of the conduct and the continuing harm to Cadient, Kronos must be enjoined from the contractually prohibited conduct—a remedy specifically provided for in the Purchase Agreement. Without a Court order

enjoining Kronos' conduct, Cadient believes Kronos will continue to breach the Purchase Agreement.

## THE PARTIES

4.     Cadient is a Delaware limited liability company with its principal place of business in Morrisville, North Carolina.  Cadient provides talent acquisition software and related services to various industries throughout North America.

5.     KTM is an Oregon limited liability company with its principal place of business in Beaverton, Oregon.  Prior to selling substantially all of its assets to Cadient pursuant to the Purchase Agreement, KTM was a provider of talent management solutions throughout the United States, Canada and Mexico.

6.     Kronos Inc. is a Massachusetts corporation with its principal place of business in Lowell, Massachusetts.  Kronos Inc. provides workforce management solutions throughout the world.  Kronos Inc. is the sole member of KTM.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the adverse parties are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).  This action arises out of the Purchase Agreement, which requires all lawsuits arising out of, based upon, or relating to the Purchase Agreement be brought in this Court.

## STATEMENT OF FACTS

**A.**   **Kronos Agreed to Sell Cadient Substantially All of the Assets of KTM**

9.     On December 21, 2018, KTM, Kronos Inc. and Cadient executed the Purchase Agreement, which called for a transaction in which Cadient would purchase substantially all of KTM's assets and assume certain liabilities of KTM for the Purchase Price.

10.     Section 1.1 of the Purchase Agreement provides:

> (a)     Upon and subject to the terms and conditions of this Agreement, [Cadient] shall purchase and accept from [KTM], and [KTM] shall sell, transfer, convey, assign and deliver to [Cadient], at the Closing, for the consideration specified below in this Article I, all right, title and interest of whatever kind, tangible and intangible, personal, real, and mixed, whether accrued, contingent, or otherwise, that [KTM] possesses and has the right to transfer in the Acquired Assets, free and clear of all Security Interests.

> (b)     Notwithstanding anything to the contrary in this Agreement, the Acquired Assets shall not include the Excluded Assets.

11.     The "Acquired Assets" Kronos agreed to sell to Cadient included, among other things, the following personal property: "all computers, servers, network equipment, furniture, fixtures, supplies, leasehold improvements, [and] other tangible personal property listed on Section 2.10 of the Disclosure Schedule." The "Excluded Assets" Kronos did not agree to sell to Cadient included, among other things, those assets listed on Schedule 1.1(b) to the Purchase Agreement.

12.     Pursuant to Section 4.3 of the Purchase Agreement, from the date of the execution of the Purchase Agreement until the closing of the transaction contemplated thereunder, KTM agreed to "conduct its operations in the Ordinary Course of Business" and "use its commercially reasonable efforts to . . . maintain the Acquired Assets in good working order and repair consistent with past practice[.]"

13.     Kronos Inc. guaranteed the obligations of its wholly owned subsidiary, KTM, under the Purchase Agreement.

14.     On April 5, 2019, after substantial due diligence, the transaction contemplated under the Purchase Agreement closed ("Closing").

**B.      In Breach of the Purchase Agreement, Kronos
        Failed to Transfer Valid Microsoft Licenses to Cadient**

15.     Kronos breached the Purchase Agreement by failing to transfer to Cadient certain Microsoft licenses that were Acquired Assets pursuant to the Purchase Agreement (the "Microsoft Licenses").

16.     KTM represented in Section 2.13(b) of the Purchase Agreement, that it "owns or has the right to use all Intellectual Property necessary to develop, use, market and distribute the Products or conduct the business of [KTM]," and that "[u]pon execution and delivery by [Cadient] to [KTM] of the instruments of conveyance referred to in Section 1.5(b)(iii), except as set forth in Section 2.13(b)

of the Disclosure Schedule, each item of Seller Intellectual Property will be owned or available for use by [Cadient] immediately following the Closing."

17.    Pursuant to Section 2.14(b) of the Purchase Agreement, KTM also represented that "[w]ith respect to each Material Contract: (i) the agreement is legal, valid, binding and enforceable and in full force and effect; and (ii) the agreement is assignable by [KTM] to [Cadient] without the consent or approval of any party (except as set forth in Section 2.4 of the Disclosure Schedule), and will continue to be legal, valid, binding and enforceable and in full force and effect immediately following the Closing in accordance with the terms thereof."

18.    The Microsoft Licenses were included as Acquired Assets and the contract with Microsoft for these licenses was defined as a Material Contract.  The Microsoft Licenses were allocated to KTM from Kronos Inc.'s enterprise license agreement with Microsoft covering all of Kronos Inc. and its other business units. In making that allocation, Kronos assigned $315,167 as the value of the Microsoft Licenses.    Accordingly,  not  only  should  the  Microsoft  Licenses  have  been transferred to Cadient at Closing, but the Purchase Agreement required that Cadient receive a valid contract to the Microsoft Licenses.  As of the date of Closing, KTM still was negotiating with Microsoft to obtain the rights to the Microsoft Licenses because KTM's rights to the Microsoft Licenses expired on March 31, 2019—five days prior to Closing.  While Kronos has conceded "there is no dispute that the rights

to use the Microsoft Licenses were schedule to be transferred with the business",
Kronos failed to properly transfer valid Microsoft Licenses to Cadient.

19.    As a result of Kronos' failure to transfer valid Microsoft Licenses,
Cadient was damaged in amount not less than approximately $315,000.

## C.    In Breach of the Purchase Agreement, Kronos Failed to Provide Critical Servers in Good Operating Condition

20.    The Acquired Assets included critical pieces of hardware—four servers
vital to software development and quality assurance, and thus the operation of the
business.

21.    Kronos represented and warranted in Section 2.10 of the Purchase
Agreement that "[a]ll tangible personal property used by [KTM] and included in the
Acquired Assets, and all of the items of tangible personal property used by [KTM]
under all leases of personal property and included in the Acquired Assets: (i) *are in
good operating condition*, maintenance, and repair (subject to normal wear and tear
given the use and age of such assets) and (ii) *are usable in the ordinary course of
[KTM's business]*." (emphasis added)

22.    Kronos also represented and warranted in Section 2.13(h) of the
Purchase Agreement that:

> All copies of source and object codes relating to all of Software that is
> Owned Intellectual Property, and all derivative works or improvements
> thereof are complete except for minor deviations that would not have a
> material adverse effect on the function or use of any of such Software.
> No Person other than [KTM] or its Affiliates possesses a copy, in any

7

form (print, electronic or otherwise), of any source code for any Product, and all such source code is in the sole possession of [KTM] or its Affiliates, and has been maintained strictly confidential. [KTM] has no obligation to afford any Person access to any such source code. [KTM] is, or will be at Closing, in possession of all necessary material relating to the Products, including installation and user documentation, engineering specifications, flow charts and know-how, reasonably necessary for the use, maintenance, enhancement, development and other exploitation of such Products as used in, or currently under development for, [KTM's] business.

23.     Less than two weeks prior to Closing, however, on or about March 24, 2019, KTM replaced four servers located in Waltham, Massachusetts and Noida, India that were critical to the business.  Two of those servers stored the application software source code and the other two servers were vital to software development and quality assurance.  Prior to Closing, KTM represented to Cadient that it had formulated a plan to replicate all information from the four existing servers to three new servers.  KTM did not allow Cadient to inspect the original servers, obtain any of the essential information stored in the original servers, and failed to provide Cadient essential information about the replacement servers.  KTM insisted that the asset purchase transaction would need to close prior to Cadient having any access to the application hosting facility or the disaster recovery facility, thereby preventing Cadient from testing the replacement severs prior to Closing.

24.     Kronos expressly represented in Section 2.10 of the Purchase Agreement that the replacement servers would enable Cadient to run the business in the regular and ordinary course post-Closing.  This representation was false.

25.    Kronos, in breach of its obligations under the Purchase Agreement, failed to provide any resources or meaningful insight into the configuration of the replacement servers.

26.    A Transition Services Agreement was executed at Closing by and among Kronos Inc., KTM and Cadient in order to ensure an orderly transition of KTM's business to Cadient and such execution was a condition to consummating the transactions contemplated by the Purchase Agreement.   Pursuant to the Transition Services Agreement, Kronos Agreed to provide Cadient with specific services set forth on Exhibit A to that agreement (the "Service Exhibit") and to "respond in good faith to any reasonable request by [Cadient] for access to any additional services that are necessary for the operation of the Business…."   The Service Exhibit specifies that Kronos was required to provide Application Hosting Support by providing Cadient "with access to its employees knowledgeable of the hosting environment [and] [s]such employees shall respond promptly to data requests and inquiries regarding application hosting to support [Cadient's] personnel."   KTM personnel who were identified as subject matter experts and had the responsibility of assisting Cadient pursuant to the Transition Services Agreement did not have information about the configurations and settings and were unable to provide any assistance to Cadient

27.    Section 1.05 of Transition Services Agreement provides:

(a)     Prior to the termination or expiration of this Agreement (or any Services provided hereunder), [Kronos Inc.] shall use commercially reasonable efforts to facilitate an orderly transition of the Services to the [Cadient] and/or its Affiliates. Upon request from [Cadient], [Kronos Inc.] shall deliver to [Cadient] copies of such documents, policies, procedures, records and information which are reasonably necessary for the [Cadient] and/or its Affiliates to reproduce the Services independently and to achieve such transition.

(b)     Without limiting the foregoing, in furtherance of its provision of the Services, [Kronos Inc.] shall (a) use commercially reasonable efforts to make available to [Cadient] the employees, contractors, agents and third-party subcontractors whose assistance, expertise or presence is necessary or useful for [Cadient] and/or its Affiliates to establish a fully functioning stand-alone environment in Purchaser's group and permit the timely assumption by [Cadient], or by a supplier to or Affiliate of [Cadient], of the Services, and (b) shall use commercially reasonable efforts to arrange for such persons to provide an opportunity to the personnel of [Cadient] and/or its Affiliates (as identified from time to time by [Cadient]) to obtain all know-how, instruction in operating processes and procedures (including, but not limited to, conveying all passwords and access codes), and other knowledge which is necessary or useful to establish a fully functioning stand-alone environment in [Cadient's] group and permit the timely assumption by [Cadient], or by a supplier of or Affiliates [of Cadient], of the Services.

28.     Due to Kronos' failure to assist Cadient with the replacement servers, Cadient was forced to incur significant expense and engage in the time-consuming task of determining how to put the new hardware (the three replacement servers) into a condition sufficient for the continued conduct of material aspects of the business as of the Closing date.  Kronos' material breach of the Purchase Agreement and Transition Services Agreement, and associated wrongful conduct, prevented

Cadient from building, maintaining, modifying, or enhancing the purchased software source code and test environments.

29.    In addition to Cadient incurring costs to put the servers in good operating condition, Cadient incurred extensive opportunity costs and lost profits due to the necessity of getting "all hands on deck" for a period of more than four months by using internal resources to bring the servers into good operating condition rather than using that time to enhance and develop the business.  Kronos was fully aware that the Cadient product enhancement plan was a critical factor in retaining customers acquired in the transaction and acquiring new customers, and a fundamental component of Cadient's motivation to enter into the Purchase Agreement.

30.    Kronos' failure to provide critical Acquired Assets in good operating condition and providing necessary assistance pursuant to the Transition Services Agreement caused Cadient's inability to: (i) win new business due to lack of required enhancements and (ii) renew customer contracts that Kronos represented to Cadient as low to medium risk of non-renewal because Cadient had not made improvements in the product.  As a result, Cadient was damaged in an amount that exceeds the full value of the Escrow Funds.

**D.    In Violation of the Purchase Agreement's Non-Compete Provision, Kronos Has Been Knowingly and Unlawfully Competing With Cadient**

31.    In exchange for the Purchase Price at Closing, Kronos agreed not to compete with Cadient for three and one-half years by agreeing not to (i) to develop, market, sell or license any competitive product, (ii) solicit, offer, market or enter into negotiations with a current customer in connection with a competitive product, and (iii) encourage, induce, or attempt to encourage or induce any customer, vendor, supplier, licensee, licensor or other business relation of Cadient to cease doing business with Cadient or to modify the way it does business with Cadient.

32.    Specifically, Section 6.3 (a) of the Purchase Agreement provides:

For a period of three and one-half (3 and ½) years after the Closing Date (the "Restricted Period"):

(i)    [KTM, Kronos Inc.] and their respective Affiliates (collectively, "Seller Restricted Parties") shall not, either directly or indirectly, (1) develop, market, sell or license any Competitive Product in the United States of America, Canada or Mexico (the "Territory"), or to any Person having material business operations in the Territory for resale or use in the Territory, or (2) or own, operate, lease, manage, control, invest in, lend to, own any equity of, permits it name to be associated with, or otherwise participate in any Person that develops, markets, sells or licenses any Competitive Product in the Territory; and

(ii)    the Seller Restricted Parties shall not (solicit, offer, market, or enter into negotiations with any Current Customer in connection with a sale, attempted sale, prospective sale, or licensing, attempted licensing or prospective licensing of a Competitive Product, or (2) encourage or induce or attempt to encourage or induce any Person who is a customer, vendor, supplier, licensee, licensor or other business relation of [Cadient]

12

to cease doing business with [Cadient] or to modify the way it does business with [Cadient] in any material adverse respect (this subsection 6.3(a) shall be referred to below as the "Non-Solicitation Covenant"). [Kronos] agree[s] to implement commercially reasonable processes in order to try and eliminate any violation of the restrictions set forth in this Section 6.3(a) by its sales force.

33.     The Purchase Agreement defines Competitive Product as "any product or service which is competitive with any Product as distributed by the Seller on the Closing Date, including (but not limited to) any software that provides talent acquisition services, an applicant tracking system and/or onboarding or assessment solutions or services."

34.     While the Purchase Agreement does contain some limited exceptions to the scope of the non-competition provision, the conduct for which Cadient is seeking relief in this action is not within the ambit of the exceptions.  Section 6.3(c) of the Purchase Agreement sets forth the exceptions with specificity:

(c) Notwithstanding the foregoing or anything else set forth herein, [Cadient] acknowledges and agrees that:

(i)     the development, marketing, distribution, sale or licensing of the Kronos Workforce Ready® solution (including the talent acquisition and recruiting module of such solution), by [KTM] or any of its Affiliates, to any person or entity that is not a Current Customer shall not be deemed to violate the covenants set forth in Section 6.3(a) above; and that

(ii)     [KTM] shall be permitted to deliver standard mass-distributed marketing and other communications delivered generally to all customers of [KTM] or its Affiliates to any Current Customer, and that such activities shall not be deemed to violate the covenants set forth in Section 6.3(a) above; provided, however, without the prior written consent of [Cadient], on a case

13

by case basis, which consent shall be at [Cadient's] sole discretion, [KTM] shall not be permitted to sell or license a Competitive Product (including the talent acquisition and recruiting module of the Kronos Workforce Ready® solution ) to any such Current Customer that is not an Inactive Customer; and that

(iii)   the marketing, distribution, sale or licensing of the talent acquisition and recruiting module of the Kronos Workforce Ready® solution bundled with such solution by [KTM] or any of its Affiliates during the Restricted Period to any person or entity that is an Inactive Customer (defined below) shall not be prohibited hereby, and shall not be deemed a violation of the Non-Solicitation Covenant; and that

(iv)   the acquisition by [Kronos] of a business that offers a Competitive Product shall not be prohibited hereby, provided that, (1) [Kronos Inc.] notifies [Cadient] in writing of such acquisition within five (5) days of the closing of such acquisition, (2) the Competitive Product does not account for more than twenty-five percent (25%) of the revenues of the acquired business at the time of the acquisition, (3) following such acquisition, the acquired business does not actively market, sell, license or continue to develop the Competitive Product (except as provided in part (4)), and (4) the acquired business and its Affiliates can continue to service and support customers of the acquired business with respect to the Competitive Product through the duration of the term of any agreements or commitments in place with such customers as of the closing of such acquisition; and that

(v)   subject to the foregoing, [KTM] shall strictly comply with the Non-Solicitation Covenant with respect to the talent acquisition and recruiting module of the Kronos Workforce Ready® solution (whether stand-alone or bundled with other products), which shall be deemed a Competitive Product for purposes of this provision (unless [Cadient] consents to exceptions thereto, on a case by case basis, which consent shall be at [Cadient's] sole discretion).

"Inactive Customer" means a Current Customer that has not been a licensee of any Product for no less than six (6) consecutive months following the Closing. For the avoidance of doubt, the Kronos Workforce Ready® solution is sold as three brands – Saashr, Workforce Ready, and Workforce Dimensions - and references herein to the Kronos Workforce Ready® solution shall include reference to such brands.

35.     Subsequent to Closing, Cadient learned that Kronos has been knowingly violating the non-competition provision of the Purchase Agreement.  In late October of 2019, Ed Park, a Vice President of Corporate Development employed by Kronos Inc., corresponded with Jim Buchanan, the Chief Executive Officer of Cadient, revealing that Kronos sales personnel were violating the non-competition provision of the Purchase Agreement by soliciting Current Customers to purchase or license the talent acquisition and recruiting module of the Kronos Workforce Ready® solution.

36.     As set forth in the Purchase Agreement, Kronos is prohibited from soliciting Current Customers in connection with a Competitive Product, which includes any talent solution module—whether it is being marketed, licensed or used in conjunction with Kronos' Workforce Ready® solution or Workforce Dimensions.

37.     Kronos has improperly marketed a Competitive Product to the following Current Customers: ███████████████████████████████

███████████████████████████████████████████████████████.

Upon information and belief, Kronos has improperly sought to market or sell a Competitive Product to at least ten additional Current Customers.

38.     ██████ became a KTM customer in October, 2017, and is a Current Customer pursuant to the Purchase Agreement.  On May 28, 2019, Diane Griswold, Vice President of Sales at Kronos, sent an email to Jon Puckett, Cadient's Vice

President of Customer Success, informing Mr. Puckett that she needs to discuss a "possible exception to the Kronos agreement."   Ms. Griswold stated that she understood that prohibition of soliciting Current Customers, but noted that ███ was not happy with either the current Kronos Workforce application or the Cadient product.   Ms. Griswold further stated that Kronos was going to demonstrate its Workforce Dimensions product and that ███ inquired about Kronos' talent acquisition solution.  This promoted Ms. Griswold to seek Mr. Puckett's permission to demonstrate the Workforce Dimensions talent module to ███.

39.    Mr. Puckett responded to Ms. Griswold that he would discuss the request internally at Cadient and would get back to Ms. Griswold by the end of the day on May 30, 2019.  On May 31, 2019, Ms. Griswold requested an update from Mr. Puckett, to which Mr. Puckett responded by asking (1) if Kronos had already demonstrated the talent module in Workforce Dimensions for ███, (2) had ███ expressed interest in the talent module within Workforce Dimensions, and (3) would ███ be interested in keeping Cadient's talent module if it was integrated with Dimensions.  Ms. Griswold replied that the demonstration was schedule to take place that day and she asked her team "not to demo talent due to our agreement but I know they will be asked and may be put on the spot."  Ms. Griswold also stated that ███ was not keeping Kronos Workforce Central and was looking at competitive

solutions.  Ms. Griswold concluded her email by stating, "not showing integrated talent is definitely hurting us."

40.     Kronos' statement that ▇▇▇ was not happy with Cadient's product did not comport with Cadient's interactions with ▇▇▇.  ▇▇▇ has never indicated that they were not satisfied with the Cadient product.  In addition, due to the fact that ▇▇▇ contract with Cadient runs through October 1, 2021, if ▇▇▇ replaced Cadient's talent module with another solution, it would be required to make double payments until the expiration of the Cadient contract.

41.     On December 11, 2019, counsel for Cadient sent Kronos a cease and desist letter demanding that Kronos cease and desist from the solicitation of Cadient's customers in violation of Section 6.3 of the Asset Purchase Agreement and requesting disclosure of Kronos' communications with Cadient's customers in a good faith attempt to avoid litigation.  Kronos never provided the requested information, and upon information and belief continued to violate Section 6.3 of the Purchase Agreement.

42.     ▇▇▇ became a KTM customer on January 2, 2013 and is a Current Customer under the Purchase Agreement.  Kronos expressly represented in the Purchase Agreement that there was a medium risk of ▇▇▇ not renewing its contract.  On November 22, 2019, Mr. Puckett received confirmation that ▇▇▇ signed a contract with Kronos for a Workforce Ready module in May 2019—the

month following Closing.  This caused ▮▮▮ to discontinue its use of Cadient's product seven months prior to the expiration of its contract with Cadient.

43.   On November 21, 2019, one day prior to Cadient learning about ▮▮▮ signing an agreement with Kronos, a Cadient employee received an email from a healthcare sales representative at Kronos, asking, "if there is a Cadient customer that is in year 4 of an agreement, does the agreement in place between the companies allow us to sell our product to someone that's wanting to leave?"  Kronos did not reveal the identity of the customer "wanting to leave."  ▮▮▮ contract with Kronos and the inquiry by Kronos caused Cadient to reasonably believe that Kronos was violating the Purchase Agreement's non-competition provision.

44.   On November 26, 2019, a Healthcare Sales Executive employed by Kronos asked a Cadient employee: "I have a customer who needs [sic] short-term talent solution until they are ready to move to WFD in the next 18-24 months.  I want to be able to sell them Talent in WFD when they make the move.  Is that possible or is that stupid rule still in place?"  The "stupid rule" referenced appears to be the non-competition provision of the Purchase Agreement.

45.   ▮▮▮ became a KTM customer on January 2, 2014, and is a Current Customer under the Purchase Agreement.  Kronos contrived a problem between Cadient and the ▮▮▮ in order to provoke Cadient's waiver of the non-competition provision and ultimately replace Cadient as the software provider

for talent acquisition, applicant tracking, and/or onboarding or assessment solutions or services.  On June 20, 2019, Larry Florio, Director of Kronos for Healthcare, sent an email to Cadient's CEO, Mr. Buchanan, about ███████.  Mr. Florio stated: "We've discovered a problem with this account.  Need to get you a head's up on where they are headed, and also to ask for some flex on a go-forward plan."  Upon receipt of this email, Mr. Buchanan asked Mr. Puckett to look into the situation, which prompted Mr. Puckett to speak to Mr. Florio by phone.

46.    On June 24, 2019, Mr. Florio sent an email to Messrs. Puckett and Buchanan, stating:

> The Problem:
>
> The 6-month post-termination quiet period causes ███ a huge issue, as they would either have to:
>
> a)  go back to paper.
>
> or b) bring in a 3rd vendor.
>
> They were livid with us when we discussed last week.

Mr. Florio concluded his email by stating:

> The alternative we would like to propose given that they are month-to-month, and have stated that they are leaving anyway, would be to architect a seamless transition period of approximately 6 months:
>
> 1) ███ gives Cadient notice.
>
> 2) On the Notice date, Kronos then writes the Workforce Dimensions deal (the whole suite) and begins implementation, which is expected to be about 6 months.

This should allow Cadient approximately 6 months of additional revenue if they ████ stay live during the transition period (and we have no reason to believe they would not).

Let me know if this works.  I'd like to get back to them ████ right away to ensure they don't make any alternative plans.

47.     On July 15, 2019, Mr. Puckett explained in an email to Mr. Florio that: "We have talked to the customer and they indicated it will be sometime in 2020 before they make any decisions.  We are working with the customer to address their concerns, so we will not waive the non-compete as requested."

48.     The correspondence from Mr. Park referenced above strongly suggests there were more instances of prohibited competition than the ones in connection with ██████████████████.  On October 29, 2019, Mr. Park stated that Kronos' sales team had "time sensitive" requests about approaching fourteen Current Customers in the retail sector, including ████.  In response to Mr. Park's correspondence, Mr. Buchanan alerted Mr. Park that a "serious issue" was developing, because (i) a few of the Current Customers about which Mr. Park inquired terminated their contracts with Cadient and (ii) the vast majority of the Current Customers inquired about were actively using Cadient's product and working with Cadient's team.  Mr. Buchanan also stated: "[o]ur preference by far is to have a healthy partnership with the Kronos sales organization where your clients can take advantage of the talent acquisition solution we offer.  However, all we've

[sic] have encountered thus far is client interference rather than client cooperation." Mr. Park responded that he would speak with the sales team make them aware of the prohibitions of the Purchase Agreement. This indicates that the sales team was not previously aware of or honoring Section 6.3 of the Purchase Agreement.

49.   Mr. Park also made the statement that, "[a] few Kronos vertical industry sales VPs (healthcare, retail, S&D) have been approaching me over the past few months with Cadient accounts that plan to end their [KTM] contract and are starting to shop for full suite solutions." The statement about Kronos VPs from a few different vertical sales sectors indicates that Kronos was approaching more than the fourteen Current Customers from the retail sector listed by Mr. Park.

50.   Of the Current Customers about which Mr. Park inquired, Kronos specifically represented to Cadient in the Purchase Agreement that only one was a high risk of non-renewal. Nine of them were represented as being low risk of non-renewal, and two were represented as being medium risk. If these Current Customers intended to terminate the relationship with Cadient shortly after Closing, either (i) Kronos misrepresented the status of the Current Customers' relationship on the Disclosure Schedules to the Purchase Agreement or (ii) Kronos flagrantly violated Section 6.3 of the Purchase Agreement.

51.   Kronos has engaged in a pattern of unlawful interference with Cadient's customers, and it did so on the heels of Kronos' failure to provide valid Microsoft

Licenses and replacement servers in good working condition—Acquired Assets critical to competing in the talent acquisition software marketplace.  As set forth herein, Cadient is aware of at least thirteen instances where Kronos has sought to sell their products to Cadient's customers—after Cadient denied Kronos' request for an exception.

52.    Upon information and belief, Kronos continues to solicit Current Customers in violation of Section 6.3 of the Purchase Agreement.

53.    None of the exceptions enumerated in Section 6.3(c) of the Purchase Agreement apply to Kronos' solicitation of Cadient's Current Customers.

54.    As a result of Kronos' unlawful competition of which Cadient is aware, Cadient reasonably estimates losses of approximately $3 million of profits.  The full extent of the damage caused by Kronos' prohibited competition with Cadient is unknown and likely irreparable, which necessitates an award of monetary damages for the conduct that already has occurred and the entry of an injunction to stop further unlawful competition.

**E.    In Violation of the Purchase Agreement's Application Hosting Provision, Kronos has Failed to Pay Required Reimbursement Amounts**

55.    In exchange for the Purchase Price at Closing, Kronos further agreed to reimburse Cadient for a portion of the fair market fees associated with the difference between the reasonable fair market value of costs associated with colocation and application services and the amounts paid for the same services under an existing

Hosting Agreement with vXchnge.  Section 6.7 of the Purchase Agreement, entitled

"Application Hosting," in relevant part provides:

> At the Closing, the Buyer will assume the Seller's co-
> location contracts (the "Hosting Agreement") with
> vXchnge (which terminates on or around May 31, 2020).
> . . .  As soon as practicable following the Closing, the
> Buyer will engage a qualified third-party firm, reasonably
> acceptable to the Seller, undertake a study to determine the
> fair market fees of a colocation facility and disaster
> recovery facility to host the applications that will provide
> services substantially similar to the services being
> provided under the Hosting Agreement. The Buyer shall
> cause such third party to consult with the Seller in the
> preparation and issuance of such study, so that the study
> shall accurately reflect the business requirements of the
> hosting solutions required by the Hosting Agreement. In
> the event the monthly fair market fees are more than five
> percent (5%) less than the monthly fees stipulated in the
> Hosting Agreement, the Seller agrees to reimburse the
> Buyer the difference between the contracted fees and the
> fair market fee for the balance of the current term of the
> Hosting Agreement (such reimbursement to be made in
> arrears following submission of reasonable evidence of
> actual paid expense).

56.    Consistent with Section 6.7 of the Purchase Agreement, and towards

the end of the Hosting Agreement term, Cadient retained an independent consultant,

Opex Technologies, to conduct a market study for colocation and application hosting

facilities which would provide data center services to Cadient in a configuration and

environment that is most like the service provided under the Hosting Agreement.

The analysis was designed to enable a fair market value cost appraisal to establish

any cost difference to meet the requirements of Section 6.7 of the Purchase Agreement.

57.    On or about May 28, 2020, Opex Technologies delivered its findings to Cadient.  The report included a market cost comparison with three competing service providers establishing that the fees and costs under the Hosting Agreement were above reasonable market value.

58.    Based upon an average of the estimated market variances for the providers Opex Technology analyzed, a fair market cost appraisal established that the amount due from Kronos as reimbursement under Section 6.7 of the Purchase Agreement based upon the fair market cost difference is $235,600.66.

59.    On or about June 15, 2020, Cadient delivered the Opex Technologies analysis to Kronos, and sought Kronos' acceptance and payment of the reimbursement amount.

60.    On or about June 16, 2020, Kronos confirmed receipt of the Opex Technologies analysis and agreed to "review" and respond.

61.    Kronos never objected or responded to the Opex Technologies analysis and, in breach of Section 6.7 of the Purchase Agreement, has never remitted the $235,600.66 reimbursement amount to Cadient.

## COUNT I
### (Breach of Purchase Agreement – Damages)

62.     Plaintiff hereby re-alleges paragraphs 1 through 61 of this Complaint as if set forth in full herein.

63.     Pursuant to the Purchase Agreement, KTM agreed to, inter alia, (i) sell certain Acquired Assets to Plaintiff, (ii) provide the Acquired Assets in good operating condition, (iii) refrain from competing with Plaintiff pursuant to the specific terms set forth in Section 6.3 of the Purchase Agreement, and (iv) pay contractually-mandated reimbursement amounts associated with certain colocation and disaster hosting services.

64.     Kronos Inc. guaranteed the performance by KTM of all of KTM's obligations and liabilities set forth on the Purchase Agreement.

65.     As set forth herein, Defendants breached the Purchase Agreement by, inter alia, (i) failing to provide valid Microsoft Licenses to Plaintiff, (ii) failing to provide certain Acquired Assets in good operating condition, (iii) attempting to market, sell or license a Competitive Product to Current Customers, and (iv) failing to pay contractually-mandated reimbursement amounts associated with certain colocation and application hosting services.

66.     Pursuant to Section 7.1 (a) of the Purchase Agreement, Defendants are required to indemnify and hold harmless Plaintiff against any and all Damages incurred by Plaintiff resulting from, *inter alia*, any breach of any representation or

warranty of Defendants contained in the Purchase Agreement or failure to perform any covenant or agreement of Defendants contained in the Purchase Agreement.

67.    Plaintiff has complied with all terms of the Purchase Agreement, including the notice provision of Section 7.3(b) in connection with its claims for indemnification under the Purchase Agreement.

68.    Plaintiff is therefore entitled to recover from Defendants all damages it has sustained as a result of their breaches of the Purchase Agreement, in amount to be proven at trial.

69.    Plaintiff is further entitled to recover its attorneys' fees and costs pursuant to Section 7.1 of the Purchase Agreement.

## COUNT II
**(Breach of Contract – Injunctive Relief)**

70.    Plaintiff hereby re-alleges Paragraphs 1 through 61 of this Complaint as if set forth in full herein.

71.    The Purchase Agreement expressly prohibits Defendants from developing, marketing, selling or licensing any Competitive Product in the Territory. Subsequent to Closing, Defendants violated this provision, and Defendants' conduct does not fall within any exception set forth in Section 6.3 of the Purchase Agreement.

72.    Section 10.12 of the Purchase Agreement provides:

Each Party acknowledges and agrees that the other Party would be damaged irreparably in the event any of the provisions of this Agreement (including Sections 6.1, 6.2 and 6.3) are not performed in

accordance with their specific terms or otherwise are breached. Accordingly, each Party agrees that the other Party shall be entitled to an injunction or other equitable relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the Parties and the manner, in addition to any other remedy to which it may be entitled, at law or in equity.

73.     As a result of Defendants' breach of the non-competition provision of the Purchase Agreement, Plaintiff has been irreparably harmed, and Defendants should be enjoined from developing, marketing, selling or licensing any Competitive Product in the Territory.

## COUNT III
### (Breach of Transition Services Agreement – Damages)

74.     Plaintiff hereby re-alleges paragraphs 1 through 61 of this Complaint as if set forth in full herein.

75.     The Transition Services Agreement is a valid and binding contract intended to ensure an orderly transition of KTM's business to Plaintiff, and was a condition to consummating the transactions contemplated by the Purchase Agreement.

76.     The Transition Services Agreement required Defendants to assist Plaintiff with information about the configurations and settings of the replacement servers provided as Acquired Assets by providing access to its employees knowledgeable about the replacement servers.

77.    The Transition Services Agreement also required Defendants to respond in good faith to any reasonable request by Plaintiff for access to any additional services that are necessary for the operation of the business acquired from KTM.

78.    Defendants breached the Transition Services Agreement by failing to provide information about the configurations and settings of the replacement servers and access to personnel knowledgeable about the replacement servers.

79.    Plaintiff is entitled to recover from Defendants all damages it has sustained as a result of their breaches of the Transition Services Agreement, in amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant enter judgment in Plaintiff's favor and against Defendants, as follows:

A.    Awarding Plaintiff compensatory damages in an amount to be proven at trial;

B.    Enjoining Defendants from the competitive activity prohibited by Section 6.3 of the Purchase Agreement;

C.    Awarding Plaintiff pre- and post-judgment interest, plus costs and expenses, including reasonable attorneys' fees; and

D.   Granting such other and further relief as the Court may deem just, equitable and proper.

Dated:  December 29, 2020

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Robert A. Weber*
Joseph B. Cicero (#4388)
Robert A. Weber (#4013)
Gregory E. Stuhlman (#4765)
Aidan T. Hamilton (#6729)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware  19801
(302) 295-0191
cicero@chipmanbrown.com
weber@chipmanbrown.com
stuhlman@chipmanbrown.com
hamilton@chipmanbrown.com

*Attorneys for Plaintiff*

*Of Counsel*:

Adam D. Cole
**CHIPMAN BROWN CICERO
  & COLE, LLP**
501 Fifth Avenue, 15th Floor
New York, New York 10017
(646) 685-8363
cole@chipmanbrown.com